PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 04-4546

———————

UNITED STATES OF AMERICA,

Appellant

v.

E.I. DUPONT DE NEMOURS AND COMPANY
INCORPORATED; CIBA SPECIALTY CHEMICALS
CORPORATION

———————

On Appeal from the United States District Court
for the District of Delaware
D.C. Civil Action No. 02-cv-01469
(Honorable Sue L. Robinson)

———————

Argued En Banc September 8, 2005
Before:  SCIRICA, *Chief Judge*, SLOVITER, ALITO,
ROTH, RENDELL, AMBRO, FUENTES, SMITH, FISHER
and NYGAARD, *Circuit Judges*

(Filed December 22, 2005)

KATHERINE J. BARTON, ESQUIRE (ARGUED)
United States Department of Justice
Environment & Natural Resources Division, Appellate Section
P.O. Box 23795, L'Enfant Plaza Station
Washington, D.C. 20026
     Attorney for Appellant

PETER BUSCEMI, ESQUIRE (ARGUED)
MICHAEL W. STEINBERG, ESQUIRE
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

RAYMOND M. RIPPLE, ESQUIRE
E.I. DuPont de Nemours and Company
Legal Department
1007 Market Street, Suite D-7012
Wilmington, Delaware 19898
     Attorneys for Appellees,
       E.I. DuPont de Nemours and Company and
       Ciba Specialty Chemicals Corporation

LOIS J. SCHIFFER, ESQUIRE
Baach Robinson & Lewis PLLC
1201 F Street, N.W., Suite 500
Washington, D.C. 20004
     Attorney for Amici Curiae-Appellees,
       American Chemistry Council

American Petroleum Institute
Chamber of Commerce of the United States of America
Corporate Environmental Enforcement Council
National Association of Manufacturers
National Petrochemical and Refiners Association
Superfund Settlements Project

---

OPINION OF THE COURT

---

SCIRICA, *Chief Judge*.

At issue is whether the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 *et seq*., authorizes the United States to recover costs incurred in the course of supervising a hazardous waste cleanup conducted by responsible private parties. We hold CERCLA provides for such recovery. Accordingly, we will overrule *United States v. Rohm & Haas Co.*, 2 F.3d 1265 (3d Cir. 1993), and reverse the order of the District Court.

## I.

The material facts are undisputed. The DuPont Newport Superfund Site is an industrial site in Delaware, owned and operated at various times by appellees E.I. DuPont de Nemours

3

and Company and Ciba Specialty Chemicals Corporation.[1] Because of severe contamination to the property and its groundwater, the site was identified in the early 1980s as a potential threat to human health. In February 1990, it was placed on CERCLA's National Priorities List. *See* 42 U.S.C. § 9605(a)(8)(B) (establishing the National Priorities List).

The EPA developed a remedial action plan, which called for various measures, including excavating and dredging contaminated soil, monitoring contaminated groundwater, and constructing treatment facilities. Because the parties could not agree on implementation, the EPA issued a unilateral administrative order directing DuPont to remediate the site in the manner set forth in the remedial action plan, subject to EPA oversight and approval. *See* § 9606 (authorizing administrative orders "as may be necessary to protect public health and welfare and the environment").

DuPont complied with the EPA's administrative order and executed a two-stage "private party cleanup action." The first stage—a "removal action" under CERCLA § 101(23), 42 U.S.C. § 9601(23)—consisted of developing project specifications and schedules tailored to the EPA's stated objectives. The second stage—a "remedial action" under CERCLA § 101(24), 42 U.S.C. § 9601(24)—consisted of the actual cleanup work, including soil excavation, remedial "cap"

---

[1]Following the convention of the parties, we refer to the appellees collectively as "DuPont."

4

construction, groundwater barrier installation, groundwater monitoring and treatment, and wetland restoration. DuPont completed the project under budget, ahead of schedule, and to the EPA's satisfaction.

The EPA supervised both stages of the cleanup. Oversight of the first stage entailed reviewing and approving (1) project specifications, (2) treatment technologies, (3) testing and sampling methods, and (4) construction schedules. Oversight of the second stage entailed monitoring, reviewing, and approving (1) design plan implementation, (2) construction schedules, (3) health and safety issues, (4) field work, and (5) field change requests. The parties stipulate that, in supervising the first stage's removal action, the government incurred oversight costs of $746,279.77. They also stipulate that, in supervising the second stage's remedial action, the government incurred costs of $648,517.17. The total cost to the government was $1,394,796.94.

The government concedes *Rohm & Haas*, 2 F.3d 1265, bars recovery of oversight costs of a removal action, but asks that we reconsider that decision and allow the EPA to recover oversight costs incurred in supervising both the removal and remedial actions of DuPont's cleanup. Alternatively, the government contends *Rohm & Haas* does not control recovery of remedial action oversight costs and asks that we allow for recovery of its costs in supervising the remedial action component of DuPont's cleanup.

5

In a memorandum order and opinion, the District Court held the government's recovery of both "removal" and "remedial" action oversight costs is barred under *Rohm & Haas*. *See United States v. E.I. du Pont de Nemours & Co.*, No. 02-1469, 2004 WL 1812704, at *6-9 (D. Del. Aug. 5, 2004). Accordingly, the District Court granted summary judgment for Dupont on all relevant claims.

The government appealed and petitioned for initial hearing *en banc*. Because of the importance of the issue and several intervening decisions from our sister courts of appeals questioning or rejecting our analysis in *Rohm & Haas*, *see, e.g.*, *United States v. Lowe*, 118 F.3d 399 (5th Cir. 1997) (holding such costs recoverable), we granted the petition. *See* Fed. R. App. P. 35(b)(1)(B).

## II.

The District Court exercised jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under § 1291. Our review on summary judgment of this interpretation of federal statutory law is plenary. *See Wheeling & Lake Erie Ry. Co. v. Pub. Util. Comm'n*, 141 F.3d 88, 94 (3d Cir. 1998).

## III.

CERCLA is a broad remedial statute, enacted in 1980 to ensure that parties responsible for hazardous waste contamination "may be tagged with the cost of their actions." *United States v. Bestfoods*, 524 U.S. 51, 56 (1998) (quoting S.

6

Rep. No. 96-848, at 13 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 6119). CERCLA is a product of Congress's judgment that "those responsible for problems caused by the disposal of chemical poisons [must] bear the costs and responsibility for remedying the harmful conditions they created." *In re TuTu Water Wells CERCLA Litig.*, 326 F.3d 201, 206 (3d Cir. 2003) (quoting *FMC Corp. v. Dept. of Commerce*, 29 F.3d 833, 843 (3d Cir. 1994) (en banc)).

CERCLA grants the executive branch, acting primarily through the EPA, "broad power to command government agencies and private parties to clean up hazardous waste sites." *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994). This "broad power" may be exercised through a government-conducted cleanup, 42 U.S.C. § 9604(a)(1),[2] followed by a cost

---

[2]CERCLA § 104(a)(1), 42 U.S.C. § 9604(a)(1), provides in part:

> Whenever (A) any hazardous substance is released or there is a substantial threat of such a release into the environment, or (B) there is a release or substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare, the President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial

recovery action, § 9607(a),[3] or through a private party cleanup,

action relating to such hazardous substance, pollutant, or contaminant at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment.

[3]CERCLA § 107(a), 42 U.S.C. § 9607(a), provides in part:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or

8

§ 9606.[4] A private party cleanup typically begins with a cleanup

---

treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for–

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

9

plan developed by the EPA. §§ 9604(c)(4),[5] 9621(a).[6] The plan

---

[4]CERCLA § 106(a), 42 U.S.C. § 9606(a), provides:

> In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.

[5]CERCLA § 104(c)(4), 42 U.S.C. § 9604(c)(4), provides:

> The President shall select remedial actions to carry out this section in accordance with section 9621 of this title (relating to cleanup standards).

10

is implemented by responsible private parties, under either a consent agreement, § 9622,[7] or a unilateral administrative order,

[6]CERCLA § 121(a), 42 U.S.C. § 9621(a), provides:

The President shall select appropriate remedial actions determined to be necessary to be carried out under section 9604 of this title or secured under section 9606 of this title which are in accordance with this section and, to the extent practicable, the national contingency plan, and which provide for cost-effective response. In evaluating the cost effectiveness of proposed alternative remedial actions, the President shall take into account the total short- and long-term costs of such actions, including the costs of operation and maintenance for the entire period during which such activities will be required.

[7]CERCLA § 122(a), 42 U.S.C. § 9622(a), provides in part:

The President, in his discretion, may enter into an agreement with any person (including the owner or operator of the facility from which a release or substantial threat of release emanates, or any other potentially responsible person), to perform any response action (including any action described in section 9604(b) of this title) if the President determines that such action will be done properly by such person. Whenever practicable and in the

11

§ 9606(a).[8]   Throughout the cleanup, the EPA maintains responsibility for oversight and certification. *See* 40 C.F.R. § 300.400(h) (2005) ("EPA will provide oversight when the response is pursuant to an EPA order or federal consent decree"); *see also* §§ 9622(a), (f)(3), (f)(5) (contemplating EPA review and certification of private party cleanups). According to the EPA, private party cleanups comprise a significant percentage of all CERCLA removal and remedial actions. *See* U.S. EPA, *Superfund: Building on the Past, Looking to the Future* 72-74 (April 22, 2004) (reporting that private parties performed 49% of removal actions and 88% of remedial actions commenced in 2003).

In *Rohm & Haas*, we held the United States cannot recover "removal action" oversight costs incurred while supervising a private party cleanup. 2 F.3d at 1278. We reasoned that *National Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336 (1974), bars recovery of such costs "unless the statutory language clearly and explicitly requires that result."

---

public interest, as determined by the President, the President shall act to facilitate agreements under this section that are in the public interest and consistent with the National Contingency Plan in order to expedite effective remedial actions and minimize litigation.

[8]See *supra* note 4 for text of 42 U.S.C. § 9606(a).

*Rohm & Haas*, 2 F.3d at 1274. Emphasizing the lack of any "explicit reference to oversight of activities conducted and paid for by a private party," *id.* at 1275, and "the dramatic and unusual effect of requiring regulated parties to pay a large share of the administrative costs incurred by the overseeing agency," *id.* at 1274, we held CERCLA lacked the requisite "clear statement." *Id.*

After we decided *Rohm & Haas*, every other court of appeals that addressed the issue either questioned or rejected our holding. *See United States v. Lowe*, 118 F.3d 399, 401, 404 (5th Cir. 1997) (rejecting applicability of *National Cable* and holding CERCLA authorizes EPA recovery of private party response action oversight costs); *United States v. Dico, Inc.*, 266 F.3d 864, 877-78 (8th Cir. 2001) (same); *Atl. Richfield Co. v. Am. Airlines, Inc.*, 98 F.3d 564, 568-69 (10th Cir. 1996) (questioning applicability of *National Cable* and holding CERCLA provides for recovery of remedial action oversight costs).[9]

---

[9]Without reference to *Rohm & Haas*, other courts of appeals have rejected the reasoning upon which we relied. *See United States v. Hyundai Merch. Marine Co.*, 172 F.3d 1187, 1190-91 (9th Cir. 1999) (declining to apply *National Cable* in similar cost recovery action under the Oil Pollution Act); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 (2d Cir. 1985) (noting EPA oversight costs "squarely fall within CERCLA's definition of response costs").

13

## IV.

### A.

We begin our analysis with the clear statement doctrine, established in *National Cable*, 415 U.S. 336, and applied in *Rohm & Haas,* 2 F.3d at 1273-74. Under the clear statement doctrine, "Congress must indicate clearly its intention to delegate to the Executive the discretionary authority to recover administrative costs not inuring directly to the benefit of regulated parties by imposing additional financial burdens, whether characterized as 'fees' or 'taxes,' on those parties." *Skinner v. Mid-Am. Pipeline Co.,* 490 U.S. 212, 224 (1989) (explaining *National Cable*). Furthermore, when Congress intends to delegate this type of discretionary authority to a federal agency, it must set forth "an intelligible principle" to constrain the agency. *National Cable,* 415 U.S. at 342 (quotation omitted).

*National Cable* addressed the Independent Offices Appropriation Act, 1952, Pub. L. No. 137, 65 Stat. 290 (1952), which allowed federal agencies to prescribe any "such fee, charge or price, if any, as [the agency] shall determine . . . to be fair and equitable taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts." *National Cable,* 415 U.S. at 337. This open-ended congressional delegation was intended to encourage self sufficiency among the agencies. *Id.* The Court found that in light of Congress's constitutionally

14

vested taxing power, *see* U.S. Const. art. I, § 8, and the apparently unbridled taxing discretion granted to the agencies under the terms of the statute, the Act approached the outer boundaries of Congress's power to delegate. In the absence of a clear statement of Congress's intent to delegate its taxing power to federal agencies, and an intelligible principle constraining the agency's exercise of such power, the Court read the Act "narrowly to avoid constitutional problems," finding the phrase "value to the recipient" to be "the measure of the authorized fee." *National Cable*, 415 U.S. at 342-43.

After *National Cable* was decided, the Court clarified that the nondelegation principle is implicated only when Congress fails to provide "an administrative agency with standards guiding its actions such that a court could ascertain whether the will of Congress has been obeyed." *Skinner*, 490 U.S. at 218 (quotation omitted). In applying the "intelligible principle" test to particular statutory delegations, the Court's "jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). The Court has "found the requisite 'intelligible principle' lacking in only two statutes," one which provided "no guidance for the exercise of discretion," and the other which "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by

15

assuring 'fair competition.'" *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 474 (2001) (citing *Panama Refining Co. v. Ryan*, 299 U.S. 388 (1935), and *A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495 (1935)). "In short," the Court has "'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" *Whitman*, 531 U.S. at 474-75 (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)).

**B.**

DuPont contends CERCLA lacks both a clear statement delegating to the EPA the authority to recover oversight costs and an intelligible principle constraining the EPA's actions in exercising such authority. For these reasons, DuPont contends reading CERCLA to allow recovery of oversight costs is barred under *National Cable*.

After reconsideration, we cannot agree. Because of significant distinctions between the statutory framework at issue in *National Cable* and the one at issue here, we no longer believe *National Cable* governs our analysis of CERCLA. *See Dico*, 266 F.3d at 877; *Lowe*, 118 F.3d at 401; *Atl. Richfield Co.*, 98 F.3d at 568. *National Cable* addressed the imposition of user fees by the Federal Communications Commission on parties it was authorized to regulate. 415 U.S. at 337-38; *see Skinner*, 490 U.S. at 224 (explaining *National Cable* struck down "agencies' efforts to receive from regulated parties costs for benefits

16

inuring to the public generally").  CERCLA neither imposes user fees or taxes, nor imposes them on a regulated industry. CERCLA response costs are restitutionary payments, imposed on those responsible for contamination to cover costs of the contamination's cleanup.  *See Dico,* 266 F.3d at 877 ("[P]rovisions allowing the EPA to recover costs are meant to make the guilty parties pay and thus are not like the user fees at issue in *National Cable*."); *Lowe*, 118 F.3d at 401 (CERCLA response costs "are neither fees nor taxes, but rather, payments by liable parties in the nature of restitution for the costs of cleaning up a contamination or a threatened contamination for which they are responsible."); *Atl. Richfield Co.*, 98 F.3d at 568 ("EPA oversight costs are not fees or taxes levied against innocent members of a regulated industry to pay the EPA's general administrative costs, but part of the damages caused or contributed to by specific persons.").  Nor does CERCLA target regulated industries, but rather "responsible parties," *see* 42 U.S.C. § 9607(a); *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 257 n.4 (3d Cir. 1992), who are held strictly liable for the costs of cleaning up contamination for which they are responsible.  *See United States v. Chromalloy Am. Corp.,* 158 F.3d 345, 351 (5th Cir. 1998) ("CERCLA establishes 'a federal cause of action in strict liability.'") (quoting H.R. Rep. No. 96-1016(I), 96th Cong., 2d Sess. 22 (1980)).

Additional distinctions between CERCLA and the statutory scheme in *National Cable* strengthen our conclusion that CERCLA's cost recovery provisions do not implicate

17

*National Cable*. CERLCA liability is judicially determined under a federal cause of action—it is not determined by administrative levy. Nor does CERCLA divorce an agency from the appropriations process, implicating agency accountability. *Compare* 26 U.S.C. § 9507(c)(1) (requiring congressional appropriation of Superfund accruals), *with Rohm & Haas*, 2 F.3d at 1274 (applying *National Cable* to ensure EPA accountability via the appropriations process).

Even if CERCLA were to implicate *National Cable*, its cost recovery provision, 42 U.S.C. § 9607, provides a clear statement of the power conferred and an intelligible principle governing the exercise of such power. *See Skinner*, 490 U.S. at 219 ("It is 'constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority.'") (quoting *Am. Power & Light Co. v. SEC,* 329 U.S. 90, 105 (1946)). The government is authorized to recover, *inter alia*, "all costs of removal or remedial action incurred by the United States government . . . not inconsistent with the National Contingency Plan." 42 U.S.C. § 9607(a)(1)–(4)(A). Government recovery of oversight costs is specifically authorized, but limited by the detailed statutory definitions of "removal action" and "remedial action," *id.* § 9601(23)–(25), and by the provisions of the National Contingency Plan. *See* 40 C.F.R. pt. 300 (2005). The National Contingency Plan sets forth, *inter alia*, "methods and criteria for determining the appropriate extent of removal, remedy, and other measures," 42

18

U.S.C. § 9605(a)(3), and "means of assuring that remedial action measures are cost-effective." § 9605(a)(7). The plan also requires documentation of all costs that are to be recovered. *See* 40 C.F.R. § 300.160(a)(1) (2005).

A responsible party may challenge oversight costs as inconsistent with the plan. *See United States v. Hardage*, 982 F.2d 1436, 1445 (10th Cir. 1992) ("[A] defendant who is declared liable for future response costs may still challenge those costs as unrecoverable because the underlying response actions giving rise to the costs are inconsistent with the NCP."). Where the government's costs are inconsistent with the plan, they should not be allowed. *See United States v. USX Corp.*, 68 F.3d 811, 817 (3d Cir. 1995) (noting that the district court "declined to grant summary judgment in favor of the United States on its damage claim . . . finding that there were genuine issues of material fact 'regarding the reasonableness of the [Remedial Investigation and Feasability Study] and whether the United States' response costs were incurred due to a 'needless and expensive monitoring study'"); *Dico*, 266 F.3d at 879; Wash. State Dep't of Transp. v. Wash. Natural Gas Co., 59 F.3d 793, 805 (9th Cir. 1995). The National Contingency Plan therefore sets forth an intelligible principle limiting the government's authority to recover CERCLA costs.

EPA recovery is further limited, and its discretion further constrained, by the statutory definition of "responsible parties." *See* 42 U.S.C. § 9607(a)(1)–(4); *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 257 n.4 (3d Cir. 1992). Under

19

CERCLA's cost recovery provisions, 42 U.S.C. § 9607(a), the EPA can recover costs only after making the requisite showing of liability under the comprehensive "responsible party" framework. These statutory standards guide the EPA and the courts, *see Skinner*, 490 U.S. at 218, and serve as constraints on the agency's cost recovery.

In sum, CERCLA represents Congress's effort to address a complex environmental problem under a comprehensive remedial statute. Congress's decision to hold responsible parties strictly liable for the government's costs of responding to hazardous waste contamination is both a reasonable exercise of legislative authority and different in kind from the unbounded delegation of taxing power at issue in *National Cable*. Furthermore, CERCLA § 107 contains a clear statement of the power conferred and "intelligible principles" to guide and constrain the agency in exercising such power. We see no constitutional delegation problem and hold *National Cable*'s narrow rule of statutory construction does not apply.

## V.

Because *National Cable* is inapposite, ordinary principles of statutory construction govern the recovery of CERCLA oversight costs. The starting point is the language of the statute. If the meaning of the text is clear, "there is no need to . . . consult the purpose of CERCLA at all." *Cooper Indus., Inc. v. Aviall Services, Inc.*, 125 S. Ct. 577, 584 (2004); *see id.* ("As we have said: '[I]t is ultimately the provisions of our laws rather

20

than the principal concerns of our legislators by which we are governed.'") (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)).  We note at the outset, however, that "CERCLA is not . . . 'a model of legislative draftsmanship'."  *United States v. Gen. Battery Corp.*, 423 F.3d 294, 298 (3d Cir. 2005) (quoting *Exxon Corp. v. Hunt*, 475 U.S. 355, 363 (1986)).  Where a statute's text is ambiguous, relevant legislative history, along with consideration of the statutory objectives, can be useful in illuminating its meaning.  *Gen. Dynamics Land Sys. v. Cline*, 540 U.S. 581, 600 (2004) (examining "the text, structure, purpose and history" of the relevant statute).

By its terms, CERCLA's cost-recovery provision holds responsible parties liable for, *inter alia*, "*all* costs of removal or remedial action incurred by the United States government or a State or an Indian tribe not inconsistent with the national contingency plan," and "*any* other necessary costs of response incurred by any other person consistent with the national contingency plan."  42 U.S.C. § 9607(a)(1)–(4)(A), (B) (emphasis added).

> "Removal action" comprises:
>
> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of a threat of release of hazardous substances into the environment, such actions as may be necessary to

21

monitor, assess and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

§ 9601(23).

"Remedial action" comprises:

those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, degrading or excavations, repair or replacement of leaking containers, collections of leachate and runoff, onsite treatment or incineration, provision of alternative water

22

supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.

§ 9601(24). CERCLA also provides that "removal action" and "remedial action" shall include "enforcement activities related thereto." § 9601(25).

The government contends its oversight of removal and remedial actions falls within the plain meaning of these provisions, and its costs are recoverable under CERCLA § 107, which holds responsible parties liable for "all" removal, remedial, or other response costs necessarily incurred by the United States.[10]    *See* CERCLA § 107(a), 42 U.S.C. §

---

[10]DuPont contends the government's position conflicts with the position the government advanced, and the Supreme Court accepted, in *Cooper Industries, Inc. v. Aviall Services, Inc.*, 125 S. Ct. 577 (2004). *Cooper* addressed whether a potentially responsible party who undertakes a cleanup without having been sued under CERCLA may seek contribution from other jointly responsible parties under CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1). The government urged the Supreme Court not to extend the statutory text of CERCLA, which authorizes contribution claims "during or following" a civil action under CERCLA § 106 or § 107(a), §§ 9606, 9607(a). *See* 42 U.S.C. § 9613(f)(1). The conflict, DuPont contends, is that the government in this case "asserts that CERCLA should be construed broadly to further certain policy concerns, so as to

23

9607(a)(1)–(4)(A) (Responsible parties shall be liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan."). For the following reasons, we agree that EPA oversight falls comfortably within the definitions of "removal action" and "remedial action."

**A.**

"Removal action" entails containing and cleaning up hazardous waste substances and includes monitoring, assessing, and evaluating "the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment." 42 U.S.C. § 9601(23). The term "monitor" in this definition is most reasonably read to encompass agency oversight. *Lowe*, 118 F.3d at 403. We construe a term not defined in a statute in accordance with its ordinary and natural meaning. *United States v. Alvarez-Sanchez,* 511 U.S. 350, 357 (1994); *Lowe,* 118 F.3d at 402. The court in *Lowe* surveyed dictionary and thesaurus meanings of "monitor" and explained:

read 'oversight' into the statutory text in provisions in which it is not present." We disagree with DuPont's characterization of the government's position. The government asserts, and we agree, that the text of CERLCA authorizes recovery of oversight costs. Policy concerns may support this conclusion, but they do not constitute the foundation of our holding.

24

"The verb 'monitor' is generally synonymous with audit, check, control, inspect, investigate, observe, oversee, regulate, review, scrutinize, study, survey, test and watch." *Lowe*, 118 F.3d at 403; *see also Atl. Richfield Co.*, 98 F.3d at 569 (same).

EPA oversight actions—reviewing, approving, and supervising project specifications, treatment technologies, testing and sampling methods, and construction schedules—fall squarely within the "monitoring" of a "removal action." These oversight actions involve inspecting and supervising both the release of hazardous substances, and the subsequent removal and disposal of released substances, and are necessary to ensure a private party cleanup is adequate to protect public health, public welfare, and the environment. Accordingly, "the term removal action includes the monitoring conducted by the EPA via its oversight activities." *Lowe*, 118 F.3d at 403.

DuPont contends the term "monitor" refers only to monitoring the "release or threat of release of hazardous substances," 42 U.S.C. § 9601(23), and does not refer to monitoring the conduct of all removal actions. We disagree. We believe "monitor" is meant to extend to the phrases that follow the phrase "release or threat of release of hazardous substances," and to include all aspects of preventing hazardous releases from adversely affecting public health, public welfare, and the environment, including EPA oversight. *See* § 9601(23).

Just as EPA oversight is a necessary part of the monitoring entailed in a "removal action," so too is it necessary

25

to the monitoring of a permanent "remedial action." The definition of "remedial action" focuses on permanent solutions, comprising those agency actions "consistent with [a] permanent remedy taken" to clean up and prevent the migration of hazardous substances. *See* § 9601(24). This includes, "*but is not limited to . . .* any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment." *Id.* (emphasis added). We believe oversight of a remedial action—including reviewing, approving and supervising design plan implementation, water sampling and treatment activities, and health and safety issues—is monitoring "reasonably required to assure" a private party remedial action will "protect the public health and welfare and the environment" under § 9601(24). *See Dico*, 266 F.3d at 878 (finding a "clear statement" in the statutory language authorizing recovery of the government's remedial action oversight costs); *see also Lowe*, 118 F.3d at 403; *Atl. Richfield Co.*, 98 F.3d at 569. Government oversight ensures a private party remedial action will be effective in preventing, minimizing, and mitigating current or threatened releases.

DuPont contends the term "monitoring" used in "remedial action" refers only to "testing and sampling the physical environment." We note no such language appears in the definition of "remedial action." But DuPont contends because the terms preceding "monitoring" describe specific actions taken to address the physical environment affected by the release of a hazardous substance, "monitoring" should be

26

similarly limited.[11]  The government contends the statutory rule

---

[11]DuPont also contrasts CERCLA's use of "monitoring" with use of the same term in the Oil Pollution Act of 1990, Pub. L. No. 101-380, § 1001, 104 Stat. 486 (1990), as discussed in *United States v. Hyundai Merch. Marine Co.,* 172 F.3d 1187 (9th Cir. 1999).  DuPont notes that the Oil Pollution Act includes an explicit provision authorizing the EPA to recover costs to "monitor all Federal, State and private actions to remove a discharge," *see Hyundai*, 172 F.3d at 1189-90 (quoting 33 U.S.C. § 1321(c)(1)(B)(ii)), and contends Congress would have included similar language in CERCLA had it intended to authorize recovery of EPA oversight costs.  We note that the language DuPont quotes does not appear in the Oil Pollution Act itself, but is rather cross-referenced from the Federal Water Pollution Control Act.  *See* §§ 1321(c)-(e).  More significantly, in interpreting the Oil Pollution Act to allow for recovery of monitoring costs, *Hyundai* relies not only on the quoted language above, but also on language providing for recovery of "costs to prevent, minimize, or mitigate" oil pollution.  *Hyundai*, 172 F.3d at 1190 (quoting 42 U.S.C. § 2701(31)).  This language is identical to the language in CERCLA's definition of removal action, which we interpret to encompass oversight costs.  *See* § 9601(23) (defining removal action to include actions necessary "to prevent, minimize, or mitigate" damage to the public health, welfare or the environment).  In any event, the Oil Pollution Act was enacted ten years after CERCLA and cannot provide guidance for Congress's intent when it enacted

27

of construction on which DuPont relies—requiring that a general word associated with or following a series of specific words must be read in light of the specific terms, *see Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307 (1961)—is inapplicable here. We agree. The term monitoring in the definition of "remedial action" is not intended as one of the enumerated specific actions immediately preceding, but rather as an action distinct in and of itself, which includes supervising the actions taken at the location of the release. One such action is the "cleanup of released hazardous substances and associated contaminated materials." 42 U.S.C. § 9601(24). Because monitoring a cleanup necessarily entails oversight of the activity that constitutes the cleanup, we conclude EPA oversight is a part of the monitoring activities referred to in the definition of "remedial action."

In a statute designed to impose the costs of cleanup on those responsible for contamination, the term "monitor" is most naturally read in the definitions of both "removal action" and "remedial action" as encompassing agency oversight. But in reaching this conclusion, we do not imply the term encompasses *only* agency oversight. Based on the language of the statute, we believe the monitoring of removal and remedial actions includes the inspection and supervision of all stages of a response action, from risk assessment, to response planning, to execution of the removal and remedial actions. We recognize monitoring the

---

CERCLA.

28

physical environment at the site of a release is crucial to defining the risk and designing an appropriate response, and our interpretation in no way undermines the EPA's authority to do so.

**B.**

The definitions of both "removal action" and "remedial action" include actions taken to prevent or minimize danger to the public and to the environment resulting from a release of hazardous substances. *See* § 9601(23) ("[R]emoval action" includes "such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release."); § 9601(24) ("[R]emedial action" includes actions "to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment."). The government contends EPA oversight fits within this aspect of both definitions because the very purpose of EPA oversight is to prevent, minimize, and mitigate damage that could otherwise result from a release of hazardous substances by ensuring private party cleanups meet CERCLA standards. We agree. Mindful that CERCLA delegates significant authority to the executive branch, acting through the EPA, to facilitate cleanups and to enforce statutory requirements, we believe EPA oversight of cleanup activities is necessary to ensure "compliance with standards aimed at the public health," *Lowe*, 118 F.3d at 403, and is accordingly

29

necessary to protect the public health and welfare under CERCLA § 101(23) and § (24), §§ 9601(23), (24).

## C.

"Remedial action" and "removal actions" are expressly defined in CERCLA to include "enforcement activities." 42 U.S.C. § 9601(25).[12] A private party cleanup is implemented by responsible private parties, but is supervised throughout by the EPA. *See* 40 C.F.R. § 300.400(h) (2005) ("EPA will provide oversight when the response is pursuant to an EPA order or federal consent decree."); *see also* 42 U.S.C. §§ 9622(f)(3), (5) (requiring review and certification of private party cleanups); § 9611(c)(8) (contemplating oversight of remedial activities resulting from consent orders or settlement agreements). EPA oversight of cleanup actions constitutes "enforcement activities," designed to ensure private party compliance with a consent agreement or a unilateral administrative order. *See Lowe,* 118 F.3d at 403 (finding EPA oversight is an "inherent and necessary enforcement element of private party response action"); *Atl. Richfield Co.*, 98 F.3d at 570 ("[M]onitoring or oversight of a private party remedial action to determine

---

[12]CERCLA § 101(25), 42 U.S.C. § 9601(25), provides:

The terms "respond" or "response" means remove, removal, remedy, and remedial action;[] all such terms (including the terms "removal" and "remedial action") include enforcement activities related thereto.

30

whether the action complies with a consent decree and the provisions of CERCLA is enforcement activity related to a remedial action, and therefore, is a response under § 101(25).").

DuPont argues "enforcement activities" refers only to specific enforcement actions taken to compel compliance when a private party fails to perform a response action satisfactorily. But the government contends the term encompasses activities designed to evaluate compliance, and therefore includes EPA oversight.[13] We believe "enforcement activities" include all aspects of ensuring CERCLA compliance, from monitoring whether a private party is in compliance with CERCLA standards to bringing a specific enforcement action where compliance is lacking. *See* Office of Solid Waste and Emergency Response, U.S. EPA, *Guidance on EPA Oversight of Remedial Designs and Remedial Actions Performed by Potentially Responsible Parties*, EPA/540/G-90/001, OSWER

---

[13]The government contends Congress was well aware the EPA viewed oversight of responsible party cleanups as an "enforcement activity" when it added this term to the definitions of "removal action" and "remedial action." During Congress's consideration of the 1986 amendments to CERCLA, the EPA submitted information to the hearing record that plainly identified responsible party oversight as an enforcement activity and cost. *See Reauthorization of Superfund: Hearings before the House Subcommittee on Water Resources of the Committee on Public Works*, 99th Cong. 667 (1985).

31

Directive 9355.5-01 (Apr. 1, 1990) (characterizing private party cleanups as "enforcement lead cleanups" and providing for enforcement activities to both evaluate and compel compliance). We conclude EPA oversight is an "enforcement activity" encompassed by the definitions of "remedial action" and "removal action."

**D.**

CERCLA § 107's authorization to recover "all" government costs of "monitoring," "enforcement activities," and any other action "necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment," 42 U.S.C. § 9607(a) (CERCLA's general cost recovery provision), demonstrates that Congress intended the government to recover costs incurred in overseeing and monitoring the cleanup actions of responsible private parties. This conclusion comports with the overall structure of CERCLA and the EPA's central role in CERCLA's enforcement. The EPA is required to manage CERCLA cleanups from beginning to end, and has authorization to recover the costs of doing so. *Id*. DuPont's narrow construction of § 107 might discourage the EPA from supervising a critical step in the cleanup process—the actual removal and remedial activity conducted by responsible private parties. A more natural reading of CERCLA § 107 permits the EPA to recover the costs associated with overseeing every stage of a cleanup action, including that of the site cleanup itself, whether that action is performed by the government or by responsible private parties. *See Lowe*, 118 F.3d at 403

("Government monitoring or oversight is an inherent and necessary enforcement element of private party response action.").

**E.**

Relying on *Rohm & Haas*, 2 F.3d at 1277-78, DuPont contends allowing oversight cost recovery under CERCLA § 107 renders other statutory provisions superfluous. In particular, DuPont cites CERCLA § 104(a)(1)[14] and §

---

[14]CERCLA § 104(a)(1), 42 U.S.C. § 9604(a)(1), provides in part:

> Whenever (A) any hazardous substance is released or there is a substantial threat of such a release into the environment, or (B) there is a release or substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare, the President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the President deems necessary to protect

111(c)(8).[15] Section 104 addresses government cleanup actions

the public health or welfare or the environment. When the President determines that such action will be done properly and promptly by the owner or operator of the facility or vessel or by any other responsible party, the President may allow such person to carry out the action, conduct the remedial investigation, or conduct the feasibility study in accordance with section 9622 of this title. No remedial investigation or feasibility study (RI/FS) shall be authorized except on a determination by the President that the party is qualified to conduct the RI/FS and only if the President contracts with or arranges for a qualified person to assist the President in overseeing and reviewing the conduct of such RI/FS and if the responsible party agrees to reimburse the Fund for any cost incurred by the President under, or in connection with, the oversight contract or arrangement. . . .

[15]CERCLA § 111(c)(8), 42 U.S.C. § 9611(c)(8), provides: Uses of the Fund under subsection (a) of this section include—

. . .The costs of contracts or arrangements entered into under section 9604(a)(1) of this title to oversee and review the conduct of remedial

34

and settlements, while § 111 addresses Superfund disbursements. §§ 9604(a)(1), 9611(c)(8). We believe our interpretation does not render these provisions superfluous or redundant but rather evidences Congress's intent to authorize reimbursement for all cleanup costs, including oversight. Nonetheless, we address DuPont's claims and conclude CERCLA § 104 and § 111 only strengthen our interpretation of § 107.

Congress amended § 104 in 1986 to authorize the EPA to enter into settlements with private parties for private cleanup actions. *See* 42 U.S.C. § 9604(a)(1).[16] Section 104(a)(1) in part provides that any settlement agreement or consent order authorizing a private party remedial investigation or feasibility study must include reimbursement of government expenses incurred in overseeing that study. Specifically, § 104 allows a responsible private party to conduct a remedial investigation or feasibility study (RI/FS) in accordance with § 122 (pertaining to settlements) if, but only if, "the President contracts with or

---

investigations and feasibility studies undertaken by persons other than the President and the costs of appropriate Federal and State oversight of remedial activities at National Priorities List sites resulting from consent orders or settlement agreements.

[16]*See supra* note 14 for text of 42 U.S.C. § 9604(a)(1).

35

arranges for a qualified person to assist the President in overseeing and reviewing the conduct of such RI/FS," and "if the responsible party agrees to reimburse the Fund for any cost incurred by the President under, or in connection with, the oversight contract or arrangement." DuPont contends this directive would be unnecessary if oversight costs were recoverable as "response costs" in a liability action under § 107. The government responds that the two sections authorize distinct forms of cost recovery—§ 104 does not render § 107(a) superfluous because the former compels an agreement to pay oversight costs in advance of a settlement, while the latter merely imposes general liability on all responsible parties, who will have to pay those costs if the government or another party pursues a cost recovery action after the cleanup.

We agree with the government. Use of the term "oversight" in § 104 neither compels nor implies the conclusion that Congress intended to exclude that term from the cost recovery provision of § 107. Our reading of § 107 makes a party liable for oversight costs but does not compel the party to agree in advance to pay such costs. This is the function of § 104, which requires that as part of a settlement agreement or consent order, a responsible party must agree in advance to pay costs incurred in overseeing an RI/FS.

Congress enacted the 1986 amendments, which added § 104(a)'s oversight language, to further CERCLA's general policy of encouraging settlement. *See Alcan Aluminum Corp.*, 25 F.3d at 1184 ("Congress amended CERCLA because it

wanted to encourage early settlement."). Legislative history suggests Congress was concerned the EPA might not pursue its oversight costs in settlement negotiations, leading to fiscal strain on the Superfund. *See* S. Rep. No. 99-11 at 39 (1985). In this context, inclusion of the term "oversight" in § 104 suggests Congress intended to guard the solvency of the Superfund by easing the EPA's recovery of oversight costs, already authorized by § 107, in settlement contexts. By requiring an express, prior agreement for payment of certain oversight costs where private parties have negotiated to undertake cleanup activities, § 104 alleviates the EPA's burden in litigating cost recovery after the fact.

The government contends DuPont's contrary interpretation creates a disincentive for settlement, conflicting with fundamental CERCLA policy. *See* 42 U.S.C. § 9622(a) (encouraging settlements "in order to expedite effective remedial actions and minimize litigation"). We agree. Were the EPA required to recover oversight costs from settling parties under § 104, but prohibited from recovering costs from non-settling parties, responsible parties might avoid settlement so as to avoid paying such costs. Absent textual support, we decline to accept an interpretation contrary to CERCLA's statutory language and objectives.

DuPont also cites CERCLA § 111 as evidence that oversight costs are not encompassed by the term "response costs." Section 111 governs Superfund disbursements to state and federal governments. Under the introductory heading "In

37

general," § 111(a) broadly authorizes Superfund payment of certain "governmental response costs." § 9611(a)(1). Section 111(c), in turn, provides that acceptable "uses of the Fund under subsection (a) of this section include" a host of specific government actions, many of which are encompassed by the preceding and more general definition of "response costs." *See* § 9611(c)(1)–(14). Section 111(c)(8) allows disbursement from the Superfund of "the costs of appropriate Federal and State oversight of remedial activities . . . resulting from consent orders or settlement agreements." § 9611(c)(8). DuPont contends Congress would not have expressly provided for Superfund payment of "oversight" costs in § 111(c)(8) if such costs were considered "response costs" under the preceding and more general language of § 111(a).

We find this argument unconvincing. As the government explains, subsection 111(c)(8) was not added to allow for recovery of costs not otherwise recoverable as "response costs." Rather, it was added to ensure that the states, in addition to the EPA, could recover oversight costs. *See* 130 Cong. Rec. H23556 (1984). Moreover, subsection 111(c)(8) is not alone in overlapping with the more general provisions of subsection (a). Other provisions of subsection 111(c), clearly encompassed by the term "response cost," overlap as well. *See, e.g.,* 42 U.S.C. § 9611(c)(3) (authorizing use of the Superfund to "identify, investigate, and take enforcement and abatement action against releases of hazardous substances," actions clearly embraced by "response costs"). In each of these cases, the overlay does not

38

demonstrate that the specified actions are outside of the scope of otherwise recoverable "response costs." Rather, it demonstrates that the function of subsections (c)(1)–(14) is to illustrate and explain the more general terms of subsection (a).

We are not convinced § 111 bears on our interpretation of the cost recovery provision of § 107. To the extent it does, the section strengthens our reading that government oversight costs are recoverable. The section provides, on its face, that the "response costs" recoverable from the Superfund "include" the "costs of appropriate Federal and state oversight." §§ 9611(c)(1), (8).

That § 104 and § 111 specify recovery of oversight costs does not mean the government is unable to recover those costs under § 107. Rather, it demonstrates Congress's intent in amending CERCLA to particularize the general cost recovery provisions of § 107 by specifying that the EPA should recover costs beforehand in settlement actions, and to ensure that states, in addition to the EPA, recover oversight costs.[17] With this in

_____

[17]We reach our conclusion based on the language of the statute. But the government contends, and we agree, the EPA's reasonable construction of § 104(a)(1) and § 111(c)(8) is entitled to some measure of *Skidmore* deference. *See United States v. Mead Corp.*, 533 U.S. 218, 234-35 (2001) (explaining *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). Although the more deferential doctrine of *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), is inapplicable, the "well-reasoned

mind, we believe the specific references to recovery costs in § 104 and § 111 reflect Congress's intent to authorize broadly the recovery of government oversight costs incurred in connection with a cleanup action. Rather than evidencing an intent to foreclose recovery of these costs, the statute appears designed to guarantee it.

## F.

Finally, we note recovery of the EPA's oversight costs comports with CERCLA's functional objectives. The structure and purposes of CERCLA lend support to our reading of the plain meaning of the statute's text. The cleanup of the Newport Superfund site was a massive undertaking, involving a comprehensive design phase, a technically challenging construction phase, and upward of $35 million in cleanup expenditures by DuPont. Working cooperatively with DuPont and Delaware state authorities, the EPA provided design input and technical oversight on matters as disparate as selecting groundwater barrier technologies, evaluating sonar data,

---

views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Mead*, 533 U.S. at 227 (citations omitted). With respect to the purposes of § 104(a)(1) and § 111(c)(8), the persuasiveness of the government's position rests on the "specialized experience" the EPA brings to bear on the issue of CERCLA enforcement. *Id.* at 235.

40

specifying seed mixtures for landfill cover, designing remedial caps for installation on steep landfill slopes, restoring wetlands, and reviewing project health and safety protocols. In the cleanup phase, the agency's activities included coordinating and monitoring certain dredging operations, collecting soil samples, supervising landfill excavation, inspecting wetland remediation, monitoring a permeable reactive barrier wall, and approving DuPont's requests to modify the cleanup plan in response to unforseen conditions. The EPA also coordinated the assistance of the U.S. Army Corps of Engineers and the U.S. Fish and Wildlife Service, among others, in project matters implicating their areas of expertise. The EPA's technical and supervisory expertise was a key element in the successful cleanup of the Newport Superfund site, showing agency oversight is central to effective remedial action under CERCLA.

DuPont and its *amicus* supporters respond that allowing the government to recover oversight costs encourages inefficiency in CERCLA enforcement, citing the EPA's allegedly excessive oversight expenditures and its "dismal track record of Superfund mismanagement." If valid, these arguments are better directed toward Congress. In any event, CERCLA itself addresses the purported problem. The statute limits the recovery of response costs, including oversight costs, to those that are "necessary" and "not inconsistent with the national contingency plan." *See* 42 U.S.C. § 9607(a)(4)(A)–(B).

41

## VI.

Citing the EPA's "excessive costs and lack of accountability to Congress," DuPont's *amici* contend that if oversight costs are recoverable, responsible parties will be held unfairly liable for the "waste and inefficiency" of EPA practices. We address this argument by reviewing the limits on cost recovery provided by the National Contingency Plan and by detailing the burden of proof and standard of review applicable to a claim that costs are inconsistent with the plan and accordingly, unrecoverable.

The National Contingency Plan limits the scope and nature of activities the EPA is authorized to charge to responsible parties. As discussed in Part IV. B. *supra*, the plan sets forth, *inter alia*, "methods and criteria for determining the appropriate extent of removal, remedy, and other measures," 42 U.S.C. § 9605(a)(3), and "means of assuring that remedial action measures are cost-effective," § 9605(a)(7). The plan also requires all recoverable costs to be documented. *See* 40 C.F.R. § 300.160(a)(1) (2005). CERCLA's cost recovery provision, § 9607(a)(4)(A)–(B), requires responsible parties to pay all costs that are not inconsistent with the plan. This standard ensures that costs will only be recoverable if they result from compliance with the plan's methods and criteria for determining appropriate, cost-effective response actions. Accordingly, the requirement that responsible parties pay only those costs that are not inconsistent with the National Contingency Plan limits the EPA's discretion in recovering oversight costs.

42

In *United States v. Northeast Pharmaceutical & Chemical Co.,* the Court of Appeals for the Eighth Circuit held response costs not inconsistent with the National Contingency Plan are conclusively presumed reasonable and therefore recoverable, and responsible parties have the burden of proving certain costs are inconsistent and not recoverable. *See* 810 F.2d 726, 747-48 (8th Cir. 1986). The court further held the arbitrary and capricious standard is the proper measure of review for the EPA's actions in incurring response costs, including oversight costs. *Id.; see also Minnesota v. Kalman W. Abrams Metals, Inc.,* 155 F.3d 1019, 1024 (8th Cir. 1998). Other courts of appeals have adopted this burden of proof and standard of review. *See Wash. State Dep't of Transp. v. Wash. Natural Gas Co.,* 59 F.3d 793, 802 (9th Cir. 1995); *United States v. Hardage,* 982 F.2d 1436, 1442 (10th Cir. 1992); *United States v. Azko Coatings of Am., Inc.,* 949 F.2d 1409, 1424 (6th Cir. 1991).

We agree EPA response costs are presumed consistent with the National Contingency Plan unless a responsible party overcomes this presumption by establishing the EPA's response action giving rise to the costs is inconsistent with the National Contingency Plan. *See Ne. Pharm.,* 810 F.2d at 747. By authorizing the government's recovery of all response costs not inconsistent with the National Contingency Plan, CERCLA creates an exception for costs that *are* inconsistent. *See* 42 U.S.C. § 9607(a)(4)(A)–(B). Responsible parties—the parties claiming the benefit of this statutory exception—carry the burden of proving that certain costs fall within the exception.

43

*See Ne. Pharm.,* 810 F.2d at 747; *see also United States v. First City Nat. Bank*, 386 U.S. 361, 366 (1967).

To establish an EPA response action is inconsistent with the National Contingency Plan, a responsible party must show the EPA acted arbitrarily and capriciously in choosing the response action. As the statute itself provides, a "court shall uphold the [EPA's] decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law." 42 U.S.C. § 9613(j)(2). We believe "determining the appropriate removal and remedial action involves specialized knowledge and expertise," and "the choice of a particular cleanup method is a matter within the discretion of the EPA." *Ne. Pharm.,* 810 F.2d at 748. DuPont has not established arbitrary or capricious government action in taking response actions that led to oversight costs. Accordingly, we "give deference to the EPA's choice of response action and will not substitute our own judgment for that of the EPA." *Hardage,* 982 F.2d at 1442.

Our dissenting colleagues contend there will be "no natural limit to the type and scope of activities that the EPA can charge to a responsible party," in part because the arbitrary and capricious standard "is a difficult one for responsible parties to meet." Dissent at 76. We cannot agree. Set forth in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the arbitrary and capricious standard is well established as the appropriate standard for most agency action. *See Citizens to*

44

*Preserve Overton Park v. Volpe*, 401 U.S. 402, 413-14 (1971). While deferential to agency decision making, "the arbitrary and capricious standard . . . contemplates a searching 'inquiry into the facts' in order to determine 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Indus. Union Dep't v. API*, 448 U.S. 607, 705 (1980) (citing *Citizens to Preserve Overton Park*, 401 U.S. at 416). We see no merit in the argument that judicial review under this standard provides no check on the EPA's recovery of oversight costs. Nor do we understand our dissenting colleagues' concern that the EPA will be able "to routinely bill responsible parties for costs that are unnecessary or excessive, but do not rise to the level of 'arbitrary and capricious.'" Dissent at 76 n.25. Costs that are unnecessary and excessive in light of the National Contingency Plan are arbitrary and capricious and should be disallowed under this standard of review. *See Kalman W. Abrams Metals, Inc.,* 155 F.3d at 1025 (holding certain response costs inconsistent with the National Contingency Plan under the arbitrary and capricious standard of review); *Wash. Natural Gas Co.,* 59 F.3d at 805 (same).

## VII.

In light of the plain meaning of the relevant CERCLA provisions, the overall statutory framework, the functional benefits of agency oversight, and the overarching statutory objective of ensuring that those responsible for environmental harm are "tagged" with "the cost of their actions," *Bestfoods*, 524 U.S. at 56 (quoting legislative history), we conclude

45

CERCLA § 107 authorizes the United States to recover costs incurred in overseeing private party removal and remedial actions that are not inconsistent with the National Contingency Plan.

We will overrule *Rohm & Haas*, reverse the order of the District Court, and remand for entry of judgment in favor of the United States.

ROTH, Circuit Judge, concurring in part:

I join the majority in the result it reaches and, for the most part, in the reasons for which it does so. I write separately for the limited purpose of expressing my concern with its application of the ordinary principles of statutory construction found throughout Section V, particularly in Subsection A. In this part of the opinion, the majority argues that the term "monitor" in the definition of removal and remedial action is most reasonably read to encompass agency oversight. Although not the full extent of the majority's argument, the monitoring provision is an important hook upon which the opinion locates agency oversight within CERCLA's mandate. I disagree with the majority's reliance on the "monitoring" provision. Instead, I agree with the government's position that the oversight aspect of removal and remedial activities falls within the description of the various activities as they are defined in "Removal action" and "Remedial action" in CERCLA §§ 101(23) and (24), and

that therefore the cost of the oversight aspect of remedial and recovery activities is recoverable under CERCLA § 107(a).

First, I conclude that the reliance on the "monitoring" provision is unnecessary. Agency oversight should naturally be included as an inherent part of any removal or remedial action taken pursuant to CERCLA. That the removal or remediation be done properly and effectively is a vital part of its being done in the first place. I find that the need to separate out the oversight portion of the performance of the enumerated removal and remedial activities is superfluous.[18]

Second, not only is the majority's reliance on "monitoring" not necessary, but it risks conflating two distinct concepts: the oversight required to make sure that a project is done properly and effectively versus the taking of water, soil, or air samples to determine the level of pollutants at a site. The interpretation of monitoring as simply the taking of samples is supported by case law. See Black Horse Lane Assoc. v. Dow Chem. Corp., 228 F.3d 275, 298 n.13 (3d Cir. 2000) ("this language plainly refers to actual monitoring, assessment or evaluation 'of a release or a threat of release.'") (emphasis added). I would not want our decision here, equating

---

[18]By analogy, when one contracts to have a house built, the contract includes costs for the contractor to oversee his workers and subcontractors. Generally, there is no need to include a separate fee for oversight since it is naturally included in the larger endeavor.

47

monitoring with oversight of every aspect of a removal or remedial action, to preclude the term "monitoring" as used in CERCLA from being interpreted in its more particular sampling sense. The monitoring provision, once meant to describe one aspect of a project, should not now be confined to encompassing only general "oversight" of the entirety of a removal or remedial action.

RENDELL, *Circuit Judge*, dissenting, with whom Judge SMITH joins.

While I agree with the majority that the analysis of the issue before us should proceed along lines distinct from those employed in the Supreme Court's opinion in *National Cable Television Ass'n v. United States*, 415 U.S. 336 (1974), and, accordingly, our opinion in *United States v. Rohm & Haas*, 2 F.3d 1265 (3d Cir. 1993), I disagree that the proper reading of the relevant statutory provisions leads to the conclusion that oversight costs are recoverable by the government in this setting. I suggest, further, that *National Cable* still offers valuable lessons that are helpful to us here.

**I.**

The last thought–that *National Cable* retains some relevance–is worthy of discussion at the outset. The concern animating that opinion was that the government was passing off onto private parties certain expenses that government agencies

48

incurred as part of their normal operations.  The Court felt that the power to recover administrative costs should not be unbridled, especially when that power was exercised at the discretion of the Executive.  *See id.* at 341 (expressing concern that the Federal Communications Commission's fee structure might force broadcasters to pay "not only for the benefits they received but for the protective services rendered the public by the Commission"); *see also Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 224 (1989) ("*National Cable Television . . . stand[s] . . .* for the proposition that Congress must indicate clearly its intention to delegate to the Executive discretionary authority *to recover administrative costs not inuring directly to the benefit of regulated parties* by imposing additional financial burdens." (emphasis added)).  These same concerns formed the basis for our opinion in *United States v. Rohm & Haas Co*, 2 F.3d 1265 (3d Cir. 1993).  There, we applied *National Cable* because we concluded that EPA oversight costs were "'administrative costs not inuring directly to the benefit of regulated parties' but rather to the public at large." *Id.* at 1273 (quoting *Skinner*, 490 U.S. at 224).

Today we reject our reasoning in *Rohm & Haas* that equated the CERCLA scheme with the improper delegation of power to assess fees in *National Cable*.  In so doing, we also reject the notion that we need to find a "clear statement" of Congress's intent to impose the agency's costs of removal or remedial action onto private parties.  However, we should not reject out of hand Judge Stapleton's well-crafted discussion and

49

study of CERCLA, his well-supported thesis regarding the language of the relevant provisions, or his conclusion that they do not reflect an intent to foist onto private parties the government's oversight costs. I suggest that Judge Stapleton's analysis, if measured under a "plain meaning," rather than a "clear statement," standard, would have reached the same conclusion.  And we should reach the same conclusion today.

The other aspect of *National Cable* and *Rohm & Haas* that we should reflect upon–even if we do not endorse the "clear statement" rule–is the healthy aversion voiced in those opinions to permitting agencies to"bill" private parties for a portion of their cost of doing business.  *Cf. id.* at 1274 (construing CERCLA to allow recovery of EPA oversight costs "create[s] the dramatic and unusual effect of requiring regulated parties to pay a large share of the administrative costs incurred by the overseeing agency").  In this case, the bill amounts to almost $1.4 million, a significant portion of which will go towards EPA payroll expenses, in addition to the nearly $35 million that DuPont has already expended to clean up the Newport site.

While it is easy to say, as the majority does, that "oversight" performed by an agency as part of its statutory duty equates to necessary monitoring activity, query whether we should construe a statutory provision to allow a wholesale transfer of the expenses of operating government to private parties where no intent to do so–and certainly no clear statement–appears on the face of the statute.  In CERCLA,

50

Congress undertook to specifically delineate the boundaries of private party liability to the EPA. Certain provisions authorized the recovery of oversight costs. Others are silent. Judge Stapleton believed that, "[g]iven the context in which CERCLA was enacted," it was "highly significant that Congress omitted any mention of oversight, or of government activities conducted under [CERCLA] § 106, in the definition of removal." *Rohm & Haas*, 2 F.3d at 1276. Given this, and given the Supreme Court's reluctance to shift government operating costs to private parties as expressed in *National Cable*, we should not stretch the meaning of the statute to impose monetary obligations that are not referenced within the four corners of CERCLA. Rather, we should focus our inquiry on what the provisions of the statute actually say. *Cf. United States v. Olson*, 125 S. Ct. 510, 511 (2005) (interpreting words in the Federal Tort Claims Act to "mean what they say"). Analyzing CERCLA under this framework, I cannot agree with the majority that CERCLA reflects any intent on the part of Congress, clear or otherwise, to allow the EPA to recover the costs of overseeing removal or remedial actions.

## II.

CERCLA section 107 provides that a responsible party "shall be liable for–all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A). Neither section 107 nor any of the other provisions of the statute that define the terms used in section

107 uses the term "oversight." The majority's reasoning involves two textual leaps that I cannot endorse. The first involves equating the word "monitoring" in the sections defining "removal" and "remedial action" with "government oversight of private party activity." This is simply not a permissible meaning of the word "monitoring" as it is used in the statute. The second leap is in saying that the authority for recovering the costs of overseeing the cleanup can be found within the definitions of "removal" and "remedial action" while at the same time contending that these costs are recoverable as "*oversight of* removal or remedial action." This interpretation is clearly at odds with the precise language of the definitions, which include "monitoring" *within* the activities that make up a cleanup. As a textual matter, *oversight of* removal and remedial actions is not subsumed within the definitions of "removal" and "remedial action."

I suggest that in *Rohm & Haas* we were appropriately skeptical of the reading the majority adopts here. We stated that "[t]he government's role in overseeing a private cleanup effort is far removed from any sort of government 'removal' or activity peripherally connected to such removal." 2 F.3d at 1278. This observation is confirmed by contrasting the activities for which the EPA seeks to recover its costs here with those that DuPont undertook in actually performing the removal and remedial action. While DuPont excavated contaminated soil, capped landfills, installed groundwater barrier walls, recovered, treated and monitored groundwater, and restored and

52

monitored wetlands and the Christina River, the EPA reviewed DuPont's remedial designs, reviewed and approved DuPont's proposed changes to the remedial plan, oversaw DuPont's activities, coordinated DuPont's activities, supervised DuPont's response, monitored DuPont, reviewed the results of one of DuPont's treatability studies, and oversaw DuPont's ground water studies.

The EPA itself considers its oversight of private party removal and remedial action to be separate from the actual performance of the removal and remedial action. In a 50-page manual detailing its oversight policy, *Guidance on EPA Oversight of Remedial Designs and Remedial Actions Performed By Potentially Responsible Parties*, OSWER Directive 9355.5-01 (April 1990), the EPA takes great pains to clarify that the private party, not the EPA, bears responsibility for the cleanup action. *See, e.g.*, *id.* at 1-1 ("PRPs and their agents are responsible for the adequacy of the design and the implementation of remedies [i.e., removal and remedial action]."; *id.* at 1-2 ("[EPA] oversight must always be structured so the PRPs, not EPA, remain legally responsible and accountable for the success of the response action."); *id.* at 2-2 ("All work is done under the PRP's control and they [*sic*] are responsible for the long term performance of the remedy."). The agency's role, by contrast, is both limited and removed from the direct response. *See, e.g.*, *id.* at 5-1 ("It is inappropriate for the Oversight Official to direct or determine the means and methods of construction. *Clearly defining these*

53

*roles*, and adhering to them, ensures that the responsibility and accountability of the construction project remains with the PRP." (emphasis added)); *id.* 2-2 ("EPA's primary goal is to confirm the PRPs [*sic*] meet all performance standards specified in the Settlement Agreement."); *id.* at x ("The ultimate goal of PRP oversight is to hold PRPs responsible and accountable for the remedial actions."). In light of the EPA's own distinction between the conduct of removal or remedial actions and the *oversight of* such actions, I find its arguments to the contrary here to be disingenuous.

As we said in *Rohm & Haas*, I "think it far more likely that Congress viewed EPA's overseeing of a private party's removal activities as qualitatively different from EPA's actually performing removal activities and intended for EPA to recover the costs of the latter but not the costs of the former." 2 F.3d at 1277. A review of the statute confirms this theory. The definitions of "removal" and "remedial action" are concerned only with actions taken directly to address a release or threat of release of a hazardous substance, not with the type of second-tier review for which the EPA seeks to recover its costs here. And other sections of the statute indicate that Congress knew how to authorize recovery for the EPA's "oversight" functions when it wanted to. In the absence of such authorization in section 107, I conclude that the EPA's oversight costs are not recoverable.

54

**A.**

The majority concludes that the EPA's "oversight" activities fall within the definitions of "removal" and "remedial action" because both definitions include the word "monitoring." It assumes that, because "oversee" is one of the possible meanings of "monitor," the statute can, and should, be read to encompass "monitoring" in the sense of "oversight." Like other courts that have found that oversight costs are recoverable under CERCLA, the majority analyzes the meaning of the word "monitor" in a vacuum. But the Supreme Court has directed that "the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States*, 508 U.S. 129, 132 (1993). "[W]here a word is capable of many meanings," it should be construed in the context of the provision as a whole "in order to avoid giving unintended breadth to the Acts of Congress." *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961); *see also Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 125 S. Ct. 577, 583 (2004) (rejecting permissive construction of the word "may" in section 9613(f)(1) of CERCLA in favor of "the natural meaning of 'may' in the context" of the broader statutory provision). Reading the definitions of "removal" and "remedial action" carefully, and in their entireties, it is clear to me that Congress was concerned with monitoring the actual release, or threat of release, of hazardous substances, not monitoring the *party* performing the removal or remedial action.

55

The definition of a "removal" is specifically limited to "such actions as may be necessary to monitor . . . the release or threat of release of hazardous substances." 42 U.S.C. § 9601(23). The other actions listed in the definition–the cleanup or removal of hazardous materials, "necessary" responses to threatened releases, the disposal of removed materials, security fencing and other measures to limit access to contaminated sites–are similarly directed towards the release or threatened release. *Id.* As we have previously explained, the definition is concerned with "actions taken to define," and contain, "the scope of the risk created by a release or threatened release," not with "actions taken to evaluate the performance of others to determine whether they are meeting their legal obligations." *Rohm & Haas*, 2 F.3d at 1276. *See also United States v. Lowe*, 118 F.3d 399, 403 (5th Cir. 1997) ("Under a plain language statutory reading with an eye to context, the monitoring provided under the removal definition relates to an evaluation of the extent of a 'release or threat of release of hazardous substances.'").

Like the definition of "removal," the definition of "remedial action" includes some "monitoring" activities. At the end of a laundry list of activities that make up a "remedial action," the definition adds "any monitoring reasonably required to assure that such actions [*i.e.*, the actions specified in the preceding list] protect the public health and welfare and the environment." 42 U.S.C. § 4601(24). As in the definition of "removal," all of the specific actions listed in the definition

56

would typically be undertaken by a first party responder addressing a release or threatened release directly. Moreover, the definition specifies that these actions all take place "at the location of the release." No text suggests that the phrase "any monitoring reasonably required," coming as it does at the end of a long list of actions "at the location of the release" that encompass the scope of a typical remedial action, somehow implicates a third party overseer of another's remedial action. Construing "monitoring" here "by the company it keeps," *Jarecki*, 367 U.S. at 307, I therefore conclude that "monitoring," in the overall context of the definition, is best understood to mean *direct* monitoring of the *contaminated site*, not monitoring of the party who is performing the cleanup of the site.

**B.**

The majority also points to language in the definitions of these phrases that includes actions taken to prevent or minimize danger to the public and the environment from a release or threat of release in support of its broad reading of those provisions. *See* 42 U.S.C. §§ 9601(23)-(24). Of course, in the abstract, EPA oversight, and, indeed, other types of EPA activity, could prevent damage that might otherwise result from a release or threat of release, just as EPA oversight might generally be described as "monitoring." But the definitions' emphases on *direct* responses to releases or threats of release belies this interpretation. Read in context, the "other action" language means such other actions taken *by the direct*

57

*responder*, not actions taken to oversee the direct response; there is no indication in the text that Congress intended otherwise. Similarly, the fact that CERCLA delegates authority to the EPA to "facilitate cleanups and to enforce statutory requirements," does not imply that it authorizes the EPA to recover the costs of those activities in actions under section 107.[19] Congress specifically defined the parameters of permissible recovery in removal actions in sections 107 and 101(23) & (24). As discussed above, the plain language of the definitions includes actions taken to contain and clean up releases of hazardous waste, but not actions taken to oversee another's containment and cleaning up of those sites.

## C.

The majority's final textual argument is that its oversight activities qualify as "enforcement activities," which section 101(25) (the definition of "respond" or "response") adds to the definition of "removal" and "remedial activities." *See* Maj. Op. at 31 ("We believe 'enforcement activities' include all aspects

---

[19]The majority's attempt to bolster its reading of the statute by reviewing the conduct of the Newport cleanup and concluding that it demonstrates that "agency oversight is central to effective remedial action under CERCLA," Maj. Op. at 40-41, is to no avail. The facts of the Newport cleanup have no bearing on what costs CERCLA authorizes the EPA to recover. That EPA oversight contributes to a remedial action does not mean that it *is* a remedial action under the terms of the statute.

58

of ensuring CERCLA compliance . . . .")  The majority here follows the lead of other courts that have addressed the issue of oversight costs and have construed "enforcement activities" in Section 101(25) broadly to comport with CERCLA's remedial objectives.  In *Atlantic Richfield Co. v. American Airlines, Inc.*, 98 F.3d 564 (10th Cir. 1996), the Court of Appeals for the Tenth Circuit acknowledged that the Supreme Court, in *Key Tronic Corp. v. United States*, 511 U.S. 809 (1994), had construed the term "enforcement activities" narrowly, but nevertheless concluded:

> it does not stretch or distort the meaning of the phrase to conclude that monitoring or oversight of a private party remedial action to determine whether the action complies with a consent decree and the provisions of CERCLA is enforcement activity related to a remedial action, and therefore, is a response under § 101(25).  We note that because CERCLA is remedial legislation, it should be construed liberally to carry out its purpose.

98 F.3d at 570 (citations omitted).  The Court of Appeals for the Fifth Circuit reached the same conclusion because it determined, based on other provisions of the statute, that "[g]overnment monitoring or oversight is an inherent and necessary enforcement element of private party response action."  *Lowe*, 118 F.3d at 403.

59

The question is not whether it would "stretch or distort the meaning of the phrase" "enforcement activities" to include EPA oversight costs; nor is it whether the statute requires the EPA to oversee private party response actions. The question is whether, in adding the phrase "enforcement actions" to the definitions of "removal" and "remedial action," Congress intended to authorize the EPA to recover from private parties the cost of overseeing their removal and remedial actions. I conclude that it did not. The common sense definition of an enforcement activity is an action taken to compel a responsible party to perform a removal or remedial action. Because I do not think that the "remedial purposes" of the statute are relevant to this inquiry, I see no need to read "enforcement activities" broadly, as the majority does, to encompass the full spectrum of the EPA's CERCLA-related activities.

**D.**

Had Congress intended to include EPA oversight within the scope of activities for which the EPA can recover, it could have very easily included the word "oversight" in section 107(a)(1)(A) or the statutory definitions of "removal" or "remedial action." As we have seen, it chose not to do so. An inspection of other provisions of CERCLA indicates that Congress knows how to authorize recovery for "oversight" expenses when it wants to; it amended two provisions to explicitly include recovery of EPA "oversight" costs in the 1986 SARA Amendments. These amended provisions set forth *limited circumstances* in which Congress intended the EPA to

60

recover its oversight expenses from a private party and obtain payment of such expenses from the Superfund. To construe the definitions of removal and remedial action to authorize recovery of oversight costs in all cases renders these provisions superfluous, which we are "loath to do." *Cooper Industries*, 125 S. Ct. at 583.

SARA amended CERCLA section 104(a)(1), which authorizes the EPA to conduct the cleanup of a hazardous waste site itself, to authorize the EPA to allow responsible parties to conduct the remedial investigation and feasibility study ("RI/FS") for potentially contaminated sites in some cases. The RI/FS is a distinct, preliminary phase of removal. The section, as amended, requires the EPA to retain outside consultants to "oversee[ ] and review[ ]" a responsible party RI/FS, and provides that the responsible party must agree to reimburse Superfund for costs incurred under such an "oversight" contract. 42 U.S.C. § 9604(a)(1). Our observation regarding this section in *Rohm & Haas* applies with equal force today: "[a]n RI/FS is . . . clearly a removal action. If Congress considered governmental oversight of a private removal action to be a removal action in itself, the provision of § 104(a) requiring reimbursement of costs incurred by the government overseeing the private RI/FS would be unnecessary as § 107(a) would authorize the recovery of such oversight costs." 2 F.3d at 1277.

The majority proffers a complicated explanation as to what section 104 means, reasoning that it performs a function

61

in addition to section 107 because it compels a responsible party to agree in advance to pay oversight costs, whereas section 107 allows recovery of such costs only after the fact.[20]  This is incorrect.  All section 104 says is that, if a private party is going to conduct the *remedial investigation* or the *feasibility study*, and the government will be expending money to oversee that preliminary activity, then the private party must agree to pay for that.  If, as the majority contends, the "plain language" of

[20]The majority's argument that the reading of section 104 that I propose above creates a disincentive for private parties to settle with the EPA, *see* Maj. Op. at 37, is based on a misunderstanding of what section 104 actually says.  That section requires the EPA to recover oversight costs from settling party *only from the RI/FS stage* of the cleanup and applies to settling and non-settling parties alike.  It does not, as the majority suggests, require settling parties to agree to pay for *all* of the EPA's oversight costs.  For example, although it did not settle with the EPA, DuPont agreed to pay, and did pay, the costs of oversight for the RI/FS portion of the cleanup, according to the terms of the statute.  *See* Appellees' Br. at 13.  Whether a settling party is required to pay non-RI/FS oversight costs depends on our decision today.  The majority's fears that parties will decline to settle to avoid paying such costs under my reading are thus unfounded.  Under my reading, neither settling nor non-settling parties would pay the EPA's non-RI/FS oversight costs because CERCLA does not authorize EPA recovery for such costs.

62

CERCLA section 107 authorizes the EPA to recover its oversight costs in all cases, there would certainly be no need to amend the statute to state that the EPA should recover its oversight costs for this specific aspect of a removal. Indeed, a private party would have no choice but to "agree" to reimburse the EPA for its costs of overseeing the RI/FS work in light of the fact that the EPA would have a right to recover all of its oversight costs as a matter of law, and could sue to recover those costs under section 107. Furthermore, if Congress's intent was to ensure that the EPA recovers its oversight costs from settling parties, one would think that it would have amended the statute to specify that such parties must agree up front to pay *all* of the EPA's oversight costs. But the amendment to section 104 requires settling parties to agree to pay the costs of overseeing *only* the preliminary assessment work. It is therefore more naturally read as an *exception* to the statute's general rule that recovery of EPA oversight costs is not otherwise authorized.

SARA also amended CERCLA to allow the EPA to seek reimbursement *from the Superfund* for its oversight costs in particular situations. Section 111 defines the types of expenses for which the Superfund can be used. Before SARA, section 111(a) specifically provided that the EPA could use the Superfund to pay for removal or remedial actions that the EPA conducted itself under section 104. 42 U.S.C. § 9611(a)(1). To the extent that the definitions of "removal" or "remedial action" include overseeing removal or remedial actions, as the EPA

63

contends, this section would presumably authorize the EPA to fund the costs of overseeing private party actions out of the Superfund. But the SARA amendments specified that, in addition to the governmental response costs provided for in section 111(a), the Superfund could also be used to pay for the costs of contracts to oversee private party RI/FS's pursuant to section 104(a)(1) and the costs of overseeing remedial activities conducted by a private party through a consent order or settlement agreement. 42 U.S.C. § 9611(c)(8). If oversight costs were already included as governmental response costs under section 111(a)(1), there would have been no need for Congress to specifically authorize reimbursement from Superfund for the EPA's expenses in overseeing private RI/FS actions in section 111(c)(8). Applying the "settled rule" that "we must, if possible, construe a statute to give every word some operative effect," *Cooper Industries*, 125 S. Ct. at 584, I must once again conclude that the costs of overseeing private party cleanup efforts are not included in the "governmental response costs" that section 111(a) authorized the EPA to recover from the Superfund.

Finally, although it purports to base its conclusion on CERCLA's language, the majority inexplicably adds that the EPA's construction of sections 104(a)(1) and 111(c)(8) is entitled to *Skidmore* deference.[21] Maj. Op. at 39 n.17. I

---

[21]Of course, given the majority's disclaimer that *Skidmore* deference is not the basis for its decision, its comments on this

64

disagree. An agency is entitled to *Skidmore* deference where its policy is "made in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Although the EPA may have more "specialized experience" than we do in the day-to-day conduct of CERCLA enforcement, the determination of the meaning of statutory language in order to decide what costs the EPA can recover under a statutory provision has always been a question for the courts. Indeed, no other court to consider the issue of the recoverability of oversight costs under CERCLA has deferred to the EPA's view as a basis for its decision. *See United States v. Dico, Inc.*, 266 F.3d 864, 877-78 (8th Cir. 2001); *United States v. Lowe*, 118 F.3d 399, 401-04 (5th Cir. 1997); *Atl. Richfield Co. v. Am. Airlines, Inc.*, 98 F.3d 564, 570 (10th Cir. 1996). The EPA's position is entitled to *no* deference here.

## III.

In my mind, the only way to reach the majority's conclusion that CERCLA authorizes the EPA to recover its oversight costs is to conduct the analysis backwards–beginning with the premise that CERCLA authorizes cost recovery broadly and scouring the statute to find a place to shoehorn oversight costs into its text. In adopting this approach, the majority follows other Courts of Appeals that have, I suggest,

point are essentially dicta.

65

been less than precise in reasoning that CERCLA is a "remedial" statute that should be broadly construed, and allowing this to influence their analysis of the statute, while purporting to apply "plain language" and other textual principles of statutory interpretation. Four other Courts of Appeals have addressed the issue of whether EPA oversight costs are recoverable under CERCLA. As the EPA and the majority point out, in each case the courts have held that such costs are recoverable. The rationale for those findings, where it is discussed,[22] appears to be based (although not always

---

[22]The Second Circuit Court of Appeals remarked, in *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1042-43 (2d Cir. 1985), that "[t]he State's costs in . . . supervising the removal of the drums of hazardous waste squarely fall within CERCLA's definition of response costs, even though the State is not undertaking to do the removal." This case is of little precedential value here, however. This statement was made in the course of evaluating the defendant's claims that he was not liable for any costs under CERCLA; the recoverability of the costs themselves does not appear to have been raised or argued as an issue in either the district court or the court of appeals. *See id.* at 1042-49. For these reasons, and because *Shore Realty* does not explain why it concludes that supervising costs are recoverable (although it does cite to sections 101(23), (24) and (25), the definitions of "removal," "remedial action" and "response action"), I do not discuss it.

66

explicitly) at least in part on the notion that CERCLA, as a remedial statute, should be construed broadly.

The Court of Appeals for the Tenth Circuit declined to adopt *Rohm & Haas*'s analysis because it concluded that "*Rohm & Haas* departed significantly from prior case law that had construed the cost recovery provisions of CERCLA broadly." *Atl. Richfield Co. v. Am. Airlines, Inc.*, 98 F.3d 564, 568 (10th Cir. 1996). It characterized our use of the *National Cable* "clear statement" standard in *Rohm & Haas* as "questionable," *id.*, but ultimately concluded that CERCLA's definitions of "remedial action" and "response action," in sections 101(24) and (25), satisfy the *National Cable* standard because they "unabiguously" allow recovery of EPA oversight costs. *Id.* at 569-571. As discussed above, the plain language of the statute does not mention or support recovery of oversight costs; it certainly does not support such recovery "unambiguously." Thus, it is at least reasonable to infer that the Tenth Circuit's analysis of the meaning of the statute was influenced by its view that CERCLA should be construed broadly and its assessment that the *Rohm & Haas* result represented a departure from prevailing CERCLA case law in this regard. *See id.* at 568 (listing cases that held that the EPA could recover its indirect and administrative costs under section 107 and district court cases rejecting *Rohm & Haas*).

The Courts of Appeals for the Fifth and Eighth Circuits echoed the Tenth Circuit's concern that *Rohm & Haas* marked a "significant departure" from prior case law that construed

CERCLA broadly. *United States v. Dico*, 266 F.3d 864, 878 (8th Cir. 2001); *United States v. Lowe*, 118 F.3d 399, 401 n.2 (5th Cir. 1997). The Eighth Circuit expressly "decline[d] to follow the Third Circuit's narrow approach" to construing CERCLA, *Dico*, 266 F.3d at 878, and the Fifth Circuit noted that, "[i]n rejecting *Rohm & Haas*," it was "in good company." *Lowe*, 118 F.3d at 401 n.2. Like the *Atlantic Richfield* court, the courts in *Dico* and *Lowe* concluded that the EPA's oversight costs were recoverable under CERCLA. The *Lowe* court reinforced its interpretation of CERCLA's text by explicitly invoking the statute's remedial purpose, concluding that "any other reading of the statutory terms under discussion would produce a result that conflicts with CERCLA's goal of compelling private parties to perform clean-up operations." *Id.* at 404. As in *Atlantic Richfield*, the courts in *Dico* and *Lowe* analyzed the statute's text, but the result that they reached seems to have been influenced by the assumed tradition of interpreting CERCLA broadly in accordance with its remedial purpose.

The majority here falls into the trap set for it by these other Courts of Appeals. Like the courts in *Atlantic Richfield*, *Dico* and *Lowe*, the majority proceeds from the assumption that CERCLA encompasses everything that could conceivably fit within its terms. As a result, it ignores what the statute *says* in favor of a reading that comports with its view of what the statute *should do*. For example, the majority reads the term "monitor" broadly in light of its view of the broad purposes of the statute: "*In a statute designed to impose the costs of cleanup*

68

*on those responsible for contamination*, the term 'monitor' is most naturally read in the definitions of both 'removal action' and 'remedial action' as encompassing agency oversight." Maj. Op. at 28 (emphasis added). Similarly, its conclusion that oversight falls within the statutory language allowing recovery for actions directed at the public health and welfare is influenced by its notion of what CERCLA does: "*Mindful that CERCLA delegates significant authority to the executive branch, acting through the EPA, to facilitate cleanups and to enforce statutory requirements*, we believe EPA oversight of cleanup activities is necessary to ensure 'compliance with standards aimed at the public health.'" *Id.* at 29 (emphasis added; citations omitted).

Although there may be good arguments for construing remedial statutes, and CERCLA in particular, broadly, *see* Blake A. Watson, *Liberal Construction of CERCLA Under the Remedial Purpose Canon: Have the Lower Courts Taken a Good Thing Too Far?*, 20 Harv. Envtl. L. Rev. 199, 294-297 (1996), the Supreme Court has not endorsed this approach. *See id.* at 258-61 ("[T]he Supreme Court *has not employed* the remedial purpose canon when construing the numerous environmental statutes [including CERCLA] enacted during the 'modern' environmental era." (emphasis added)). In its most recent pronouncements on CERCLA, in *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 125 S. Ct. 577 (2004), the Court emphasized that CERCLA is subject to the same canons of statutory construction that govern all other federal statutes

69

and cautioned lower courts against straying too far from the statute's text. *Cooper Industries* is only the latest example in the Court's CERCLA jurisprudence to decline to apply special rules of statutory interpretation that would tilt the scales towards CERCLA's remedial purpose.[23] I read the Court's CERCLA cases, and *Cooper Industries* in particular, to caution against the expansive interpretation of CERCLA's provisions that the majority espouses here.

*Cooper Industries* involved section 113(f)(1) of CERCLA, which authorizes private parties who have cleaned up properties contaminated by hazardous substances to seek contribution from other CERCLA "responsible parties." The first sentence of section 113(f)(1) allows a party to obtain contribution "during or following any civil action" under CERCLA section 106 or 107(a); the last sentence provides that "[n]othing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under" CERCLA section 106 or 107(a). 42 U.S.C.

---

[23]*See, e.g.*, *Key Tronic Corp. v. United States*, 511 U.S. 809, 814, 818-19 (1994) (acknowledging that CERCLA is a "comprehensive statute" that confers "broad powers" on the executive branch, but declining to read the term "enforcement activities" broadly to authorize private parties to recover attorneys' fees).

§ 9613(f)(1).[24]   The question for the Court was whether a private party who has not been sued under section 106 or 107(a), *i.e.*, who conducted a CERCLA cleanup voluntarily, can obtain contribution under section 113(f)(1). *Cooper Industries*, 125 S. Ct. at 580.   The Court concluded that the "natural meaning" of the first sentence of section 113(f)(1), the "enabling clause," is that "contribution may only be sought subject to the specified conditions, namely, 'during or following' a specified civil action."   *Id.* at 583.   The last sentence, which the Court characterized as a "saving clause,"

---

[24]The full text of 42 U.S.C. § 9613(f)(1) reads:

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title.   Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law.   In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.   Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

71

provides only that section 113(f)(1) "does nothing to 'diminish' any cause(s) of action for contribution that may exist independently of § 113(f)(1)"; it does not, on its own, authorize contribution claims outside the scope of those specified in the sections's first sentence. *Id.* at 583-84.

The Court of Appeals for the Fifth Circuit, sitting en banc, had reached the opposite conclusion, in part based on its view that the purposes of CERCLA would be furthered by a more expansive reading. The majority noted the EPA's broad remedial powers under CERCLA and the statute's broad definition of a "responsible party." "These circumstances," it concluded, "together with the enormous costs of remediating hazardous waste sites, make the availability of contribution among PRPs all the more important for achieving the purposes of the statute." *Aviall Servs., Inc. v. Cooper Indus., Inc.*, 312 F.3d 677, 681-82 (5th Cir. 2002) (en banc). The Supreme Court, however, focused *exclusively* on the statute's text. It first examined the "natural meaning" of the first sentence. The Court construed the words in the sentence narrowly in light of the sentence's "enabling" function: "the natural meaning of 'may' *in the context of the enabling clause* is that it authorizes certain contribution actions–ones that satisfy the subsequent specified condition–and no others." *Id.* at 583 (emphasis added). The Court also found that a permissive reading would "render part of the statute entirely superfluous, something we are loath to do," *id.* (citing *Hibbs v. Winn*, 124 S. Ct. 2276, 2286 (2004)), in light of limiting language in section 113(f)(1)

72

itself and another section, section 113(f)(3)(B), that permits contribution actions after settlements. It rejected the argument that the last sentence of section 113(f)(1) authorized contribution claims outside of the scope of those authorized in the first sentence because that interpretation "would again violate the settled rule that we must, if possible, construe a statute to give every word some operative effect." *Id.* at 584 (citing *United States v. Nordic Village, Inc.*, 503 U.S. 30, 35-36 (1992)). Finally, the Court declined to consider arguments from both parties to the effect that the purpose of CERCLA supported its position: "Given the clear meaning of the text, there is no need to resolve this dispute or to consult the purpose of CERCLA at all." *Id.* at 584.

The *Cooper Industries* Court also impliedly cautioned lower courts against applying special rules of statutory construction in the CERCLA context. The Court noted that the statute, as originally enacted, did not expressly provide a private right of action for contribution, but that several district courts had "nonetheless held" that such a right existed even though "CERCLA did not mention the word 'contribution.'" *Id.* at 581. It characterized the holdings of those opinions as "debatable" in light of Supreme Court decisions that had refused to recognize implied or common law rights of contribution in other statutes. *Id.* And later in the opinion, when the Court remanded the case for consideration of whether CERCLA section 107 creates a private right of action for contribution, the Court warned that "this Court has visited the

73

subject of implied rights of contribution before." The Court further noted that "in enacting § 113(f)(1), Congress explicitly recognized a particular set of claims . . . of the contribution rights previously implied by courts from the provisions of CERCLA and the common law," *id.* at 586, and cited a case that explains that "it is an elementary canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transam. Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979). The Court thus left little doubt about where it stands on the specific issue of implied rights of contribution in CERCLA, and hinted strongly that it disapproves of the practice of construing CERCLA broadly to "give effect" to its remedial purpose.

*Cooper Industries* thus provides several lessons for the interpretation of CERCLA that apply with equal force here. In construing CERCLA, courts should pay particular attention to the text of the provisions at issue. We should construe CERCLA to avoid rendering provisions, or even individual words, superfluous, and the statute's remedial purpose should not affect the analysis if the meaning of the text is "clear." Here, were we to heed this advice by reading CERCLA according to its terms, I conclude that we would find the EPA's oversight costs not to be recoverable as costs of "removal" or "remedial action."

74

## IV.

My reading of the statute is further bolstered by certain prudential concerns implicated by the majority's approach. First, construing CERCLA to authorize the EPA to recover oversight costs raises questions of fairness and due process. Principles of fundamental fairness and due process require that those who violate the law know of their potential exposure. *See BMW of N.A., Inc. v. Gore*, 517 U.S. 559, 574 (1996) ("Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."). In the CERCLA context, responsible parties can work with the EPA to develop a remedial action plan, which should provide the party with a reasonable estimate of its ultimate liability. *See* 42 U.S.C. § 9604(a) (allowing private parties to conduct preliminary remedial investigation and feasibility studies); § 9621(a) (requiring the EPA to determine appropriate remedial action plan "which provide[s] for cost-effective response"). Under section 106, the responsible party can then undertake to implement that plan itself. One of the primary benefits of this arrangement is that the private party can control the cost of the cleanup operation within the parameters of the plan. *See Rohm & Haas*, 2 F.3d at 1270 ("[Section] 106 consent orders appear to be the favored method of cleaning up waste sites since they generally are quicker and involve less government expense than cleanups conducted by the government pursuant to § 104.").

75

Allowing the EPA to bill the responsible party for its "oversight" activities after the fact destroys the fairness and predictability of the statutory arrangement.

Second, I worry that there is no natural limit to the type and scope of activities that the EPA can charge to a responsible party under the majority's rationale. The "arbitrary and capricious" standard it articulates is a difficult one for responsible parties to meet.[25] And although the majority takes

---

[25]The majority cites *Minnesota v. Kalman W. Abrams Metals, Inc.*, 155 F.3d 1019 (8th Cir. 1998), to show that courts can and have applied the "arbitrary and capricious" standard to limit cost recoveries. Maj. Op. at 45. But that case presented egregious circumstances and actually demonstrates the rare situation in which an agency's costs could be challenged. In *Kalman Metals*, the court denied the state agency's cost recovery action because the state agency that conducted the cleanup "obstinately insisted on employing an untried, high-risk, high-cost remedy; failed to adequately study the nature and extent of the communication problem in advance; and failed to monitor [its contractor] and modify the remedy when the unevaluated problem turned out to be greater than anticipated." 155 F.3d at 1025. That the court denied cost recovery in that case does nothing to alleviate my concern that the result that the majority reaches provides no check on the EPA's ability to routinely bill responsible parties for costs that are unnecessary or excessive, but do not rise to the level of "arbitrary and capricious."

76

comfort in the statute's limitation of the EPA's cost recovery to those costs that are "necessary" and "not inconsistent with the national contingency plan," 42 U.S.C. § 9607(a)(4)(A)-(B), it has not identified any standards within the national contingency plan that would appear to limit the EPA's discretion to spend money to oversee private party cleanups. Indeed, there are none.[26] By contrast, the plain reading of the statute that I have outlined above clearly distinguishes between recoverable and non-recoverable costs. The costs of direct action to investigate or address a release or threat of release of a hazardous substance are recoverable. "On the other hand, if what the government is monitoring is not the release or hazard itself, but rather the performance of a private party, the costs involved are non-recoverable oversight costs." *Rohm & Haas*, 2 F.3d at 1278-79. In addition to being more faithful to the statutory text, I believe that this reading provides responsible parties with a fairer result.

---

[26]The sections of the national contingency plan that deal with removal and remedial action under CERCLA, 40 C.F.R. §§ 300.410, 300.415 (removal); §§ 300.420-300.435 (remedial action), set forth the criteria, methods and procedures that an agency must follow in conducting a cleanup. They do not even mention, let alone provide standards against which a court could evaluate, an agency's *oversight of* a cleanup conducted by a responsible party.

## V.

For all of the reasons stated above, I conclude that CERCLA does not authorize the EPA to recover the costs of overseeing removal and remedial actions conducted by private parties.  I therefore respectfully dissent.